## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| BARRY JAMES and APRIL JAMES, | * | Chapter 7 |
| d/b/a PREHISTORIC JOURNEYS, | * | |
| Debtors | * | |
| | * | Case No.: 1-05-bk-05108MDF |
| | * | |
| LAWRENCE G. FRANK, Trustee, | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Adv. No.: 1-05-ap-00183MDF |
| | * | |
| RON FRITHIOF, KIM HOLLRAH, | * | |
| MELODY HARRELL and | * | |
| FRED DEBROVNER, | * | |
| Defendants | * | |

### OPINION

### I. Background

Barry and April James ("Debtors") operate a business[1] known as "Prehistoric Journeys"
in which they prepare and mount the skeletal remains of dinosaurs and other prehistoric animals
for public or private display. Barry James ("Barry") is a vertebrate paleontologist and April
James ("April") has a master's degree in anthropology. Since 1986, they have prepared and
mounted over 150 specimens, which are displayed in various museums and private collections.

On August 4, 2005, Debtors filed a Chapter 7 bankruptcy petition. Lawrence G. Frank
(the "Trustee") was appointed to administer the estate. One of the estate assets reported on
Debtors' schedules was an account receivable due from Ron Frithiof ("Frithiof") in the amount
of $75,000. This purported receivable arose from services Debtors had provided preparing the
fossilized remains of a juvenile Tyrannosaurus rex (nicknamed "Tinker"). On October 26, 2005,

---

[1]Prehistoric Journeys is not registered as a business entity with the Pennsylvania
Department of State, Bureau of Corporations.

the Trustee filed the within Complaint to recover this receivable, asserting that Tinker was

subject to an artisan's lien to secure the estate's interest in the value of professional services

rendered by Debtors pre-petition.[2] The Trustee also argued that he was entitled to a recovery in

*quantum meruit* from the Defendants. For the reasons set forth below, judgment will be granted

in favor of the Trustee and against Defendants Frithiof and Hollrah on the artisan's lien claim

and against the Trustee and in favor of Defendants on the *quantum meruit* claim.[3]

## II. Factual Findings[4]

The Trustee's claim arises from a contract (the "Tinker Contract") Debtors entered into

on January 31, 2003 with Frithiof and Kim Hollrah ("Hollrah") jointly as "The Tinker Group"

and Fred Debrovner ("Debrovner") and Cynthia Norrgran ("Norrgran") for Colorado Dinosaur

Co., Inc. ("Colorado Dinosaur").[5] In the Tinker Contract, Debtors and Colorado Dinosaur were to

---

[2]Harding County and one of its residents, Casey Olson, were originally named as Defendants in this action. On January 21, 2011, the parties filed a stipulation agreeing that the case should be dismissed as against Harding County and Casey Olson.

[3]This Court has jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(B). This Opinion constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure 7052.

[4]Some of these finding are taken from the Opinion on a motion dismiss that I issued on April 19, 2007. These findings, repeated herein for the sake of clarity, are augmented by finding from the trial held on July 8, 2010.

[5] The contract was signed by Barry on behalf of Prehistoric Journeys on January 31, 2003, by Debrovner on behalf of Colorado Dinosaur on February 1, 2003, and by Hollrah and Frithiof on behalf of The Tinker Group on February 12, 2003.

2

prepare and mount the fossil and to help market it for sale on behalf of Frithiof and Hollrah, who

owned the remains under the terms of the lease for the site where the bones were discovered.[6]

Not all of the parties to the Tinker Contract knew each other before deciding to pursue

this business venture. Debtors met Debrovner through his wife, Norrgran, who previously had

been a client of Prehistoric Journeys. In late 2002 or early 2003, Debtors, Debrovner, and

Norrgran discussed a separate project in which the parties would fabricate and sell dinosaur

skeleton replicas incorporating dinosaur bones or bone fragments. In order to pursue this venture,

Debtors moved from Sunbury, Pennsylvania to Norrgran's and Frithiof's home in Colorado,

nicknamed "Jurassic Pines." At Jurassic Pines, Debtors were provided with living quarters and a

workshop.[7]

Debrovner and Frithiof became acquainted after Debrovner saw specimens from

Frithiof's personal dinosaur bone collection at a Denver fossil show. Debrovner then contacted

Frithiof to discuss the possibility of a business arrangement through which Frithiof would supply

bones or bone fragments to be incorporated into the replicas that Colorado Dinosaur and

Prehistoric Journeys would manufacture. Sometime in late 2002 or early 2003, Debrovner,

Frithiof, and Barry met at Frithiof's Texas ranch to discuss the business proposal in more detail.

These negotiations culminated in the Tinker Contract under which Debtors would prepare and

_____

[6] Melody Harrell ("Harrell") was named as a defendant in this action, because she is the widow of one of the lessees on the ground lease for one of the sites where Tinker was found. She is not a party to the Tinker Contract and the agreement states that Frithiof and Hollrah own the Tinker specimen. Therefore, judgment on the artisan's lien will not be entered against her.

[7]Debtors entered into an agreement to sell their existing workshop and residence in Sunbury, Pennsylvania in order to move to Colorado. However, this agreement did not consummate in a sale, and Debtors ultimately moved back to Sunbury.

3

mount the Tinker skeleton in exchange for a percentage of the price ultimately obtained from a buyer after the project was completed. Within several weeks following the execution of this contract, Barry and Debrovner traveled to a facility in Iowa where approximately sixty bones belonging to the Tinker fossil were being stored, packed them into a truck, and drove them to Jurassic Pines. After a return trip to Pennsylvania, Debtors relocated to Colorado and began work on the Tinker project.

Around the same time Debtors signed the Tinker Contract, they entered into a second agreement (the "Jurassic Pines Agreement") with Debrovner and Norrgan whereby Debtors would be permitted to use Jurassic Pines for preparing and mounting Tinker, as well as for other projects. Under the terms of the Jurassic Pines Agreement, Colorado Dinosaur would advance Prehistoric Journeys $50,000 "as deposit for the preparation and articulated mounting of Tinker," which would be repaid when Tinker was sold.

In early May 2003, Frithiof twice visited Jurassic Pines. On his second trip, about May 12, 2003, Frithioff delivered the bones of two other specimens, a duckbill dinosaur, referred to as "TC,"[8] and a "tenaspondelosis" or dimetrodon.[9] In a letter dated May 24, 2003 that April sent to friends describing Debtors' activities at Jurassic Pines, she states that "[t]his past Friday marked our eighth week in Colorado." She further reports that in addition to Tinker, most of the bones for TC were at their workshop. She also remarks that during the week prior to her letter, Barry

---

[8] Work performed by Debtors on the duckbill dinosaur was the subject of another suit filed by the Trustee, which was resolved by settlement.

[9] Frithiof referred to the specimen as a "tenaspondelosis," but admitted that he was unable to spell the name correctly. There is no dinosaur group with this name that the Court could identify, but there is a group of primitive amphibians known as temnospondyls. I will refer to this specimen as a dimetrodon, which was the term used by Barry.

4

"focused" on a "unique little reptilian dinosaur," which seems to be a reference to the dimetrodon. The dimetrodon had been prepared and mounted incorrectly, so Frithioff asked Barry to reassemble the specimen. When Frithiof visited Jurassic Pines in June, the dimetrodon was substantially completed.

After Debtors began working on Tinker and other dinosaur projects at Jurassic Pines, issues arose regarding title to the bones being excavated from a site in Harding County, South Dakota. Frithiof had first obtained Tinker bone fragments around 1998 after they were discovered on or near a South Dakota ranch. Frithiof, Hollrah, and Mike Harrell executed a ground lease with the ranch owner to allow them to hunt for more fossils on the site. At some point thereafter, Frithiof became aware that the location of the excavation site was adjacent to land owned by Harding County. In November 2000, Frithiof and Harding County executed a five-year ground lease granting Frithiof legal title to all fossils found on the county-owned property. However, on May 23, 2003, Harding County issued a notice rescinding the lease and, shortly thereafter, filed an action in the United States District Court for the District of South Dakota against Frithiof, Hollrah, Melody Harrell, and others. The notice asserted that the lease was invalid because Frithiof had negotiated it without disclosing that he previously had found valuable fossils on the property. Harding County alleged that the lease was invalid, accordingly any fossils in The Tinker Group's possession or control had been improperly removed and must be returned.

After receiving notice that Harding County had rescinded the lease, Frithiof drove to South Dakota to retrieve the remaining fossils extracted from the site. En route back to Texas, he stopped at Jurassic Pines on June 7, 2003 to inform Debrovner and Barry of the county's action.

5

Because of the pending litigation, Frithiof directed the parties to stop working on Tinker. Debtors continued to work on other projects, including the duckbill dinosaur and the dimetrodon. After Debrovner requested Debtors to pay $2500 per month in rent for the use of the residence and workshop, Debtors decided to move back to Pennsylvania. The parties agreed that Debtors would take the Tinker fossil with them and recommence work in the event that the Harding County litigation was resolved in favor of The Tinker Group. Debtors continued to work on other projects once they returned to Pennsylvania, but no further work was performed on Tinker.

In early 2005, Barry contacted Frithiof requesting that he either advance funds for them to continue their work on preparing and mounting the duckbill skeleton or compensate them for their previous work and expenses on the Tinker project. When the parties were unable to come to an agreement, Debtors' filed their bankruptcy case.

When Debtors filed their petition, the South Dakota case against Frithioff and others was still pending. On June 2, 2006, the District Court issued an opinion and order in which it found that the lease was invalid and granted summary judgment in favor of Harding County. *See Harding County, South Dakota v. Frithiof*, 2006 WL 1541017 (D.S.D.). This Order was appealed to the Court of Appeals for the Eighth Circuit, and a decision reversing and remanding the case to the district court was issued on April 4, 2007. See *Harding County, South Dakota v. Frithiof*, 2007 WL 1012979 (8th Cir.). On February 5, 2008, the District Court issued a ruling granting summary judgment in favor of Frithiof. Harding County appealed this ruling to the Court of Appeals, which affirmed summary judgment for Frithiof on August 10, 2009. This

6

decision effectively validated the Harding County lease and allowed Frithiof to resume excavation of the remaining bones at the site.[10]

During the time he worked at Jurassic Pines, Barry extracted bone fragments from the larger blocks of native rock and soil in which the Tinker fossil was encased. There were twenty-eight of these encasements, referred to as "plaster jackets" because of the layer of protective plaster that had been applied to them in the field at the time of extraction. The sizes of the jackets varied and relate to the amount of time and effort necessary to remove the fossils, but the parties' descriptions of the jackets are not uniform. At one point, Barry described the general dimensions of the jackets as "two by three feet"[11] (N.T. 84), and the tenor of his testimony was that all of the jackets were quite sizeable. On the other hand, Frithiof testified that some jackets were only the size of "a dinner plate" (N.T. 147, 172) and that most of them were "pretty small." (N.T. 172).

Barry testified that he alone worked on removing the bones from the jackets. However, he did not maintain a contemporaneous record of the number of hours he devoted to that phase of the project. In fact, he testified that it would have been "almost impossible" to maintain such a record. (N.T. 31) He described the extraction process as one that could be quite painstaking, especially when the "matrix" (the rock and soil encasing the bones) was hard. He described the matrix surrounding the Tinker fossil as "an iron oxide dirt material, which is almost like

_____

[10]Excavation of the site was taking place even on the date of the trial of this matter. Frithiof had been on-site on the day prior to trial, and he was excused from the courtroom shortly after his testimony concluded so that he could catch a flight returning him there.

[11]He did not provide a third dimension, so it is unclear as to what combination of height, width and depth he intended to describe.

7

concrete." (N.T. 30.) Frithiof also used the term "ironstone" with reference to the material in the jackets and described the soil at the site as "sandy." (N.T. 134)

Regardless of the hardness of the matrix, the task of extracting dinosaur bones from a plaster jacket requires an ability to develop an accurate mental image of the shape, size, and positioning of the bone within the jacket and the expertise to gently remove the adherent matrix so that the bone is not damaged. Extraction of a particularly delicate specimen may require the use of specialized pneumatic devices, some as small as a pen. Barry testified that to fulfill his obligations under the contract, he devoted sixteen hours of time to each Tinker jacket, for a total of 448 hours of work on that phase of the project.

In addition to the jacketed material that was removed from the South Dakota site, quantities[12] of matrix were also removed as "provenance" of the authenticity of the bones. Barry testified that April and Debtors' adult daughter, Catherine, devoted fifty-six hours per week for four weeks (a total of 224 hours) to the task of sifting through this matrix in search of fossil fragments. He did not provide any testimony regarding the number of fragments, if any, they found or the value added to the Tinker skeleton as a result of their work. Neither April nor Catherine testified at trial.

Barry and April worked in combination to prepare individual bones for mounting after Barry's work on the jackets ended. He estimated that they devoted a total of 672 hours (fifty-six hours per week for twelve weeks) to this task.

---

[12]Frithiof described the quantity as "several big bags." (N.T. 116.) Barry testified that the amount was between five hundred and eight hundred pounds. (N.T. 44.)

8

Barry testified that he informed the Trustee in 2005 that his hourly rate for his services ranged from $50 to $100, depending on the work required on the specimen. He also testified that in 2009 he charged as much as $200 per hour, again depending on the size of the specimen. The Trustee also presented the testimony of an expert, Charles Magovern ("Magovern"), who testified that he specialized in preparing small dinosaur specimens and, at the time of trial, was charging $50 an hour. He further testified that in 2003, when the work on Tinker was performed, he would have charged about $35 an hour.

In the matter before me, the Trustee asserts that the aggregate amount of the time spent on each of these task categories – removing the jackets, sifting the matrix, and preparing the bones – multiplied by a reasonable hourly compensation figure is the appropriate measure of the damages.

### III. Discussion

The Complaint in this case asserts a claim for the imposition of an artisan's lien against the Tinker bones held by the Trustee. At the time of trial, the Trustee also alleged a cause of action in *quantum meruit* based on the work performed by Debtors on those fossils. I will address *quantum meruit* claim first.

*A. The Trustee's case for damages in* quantum meruit

Under Pennsylvania law[8], "*quantum meruit* is an equitable remedy to provide restitution for unjust enrichment in the amount of the reasonable value of services." *American and Foreign*

---

[8]Tinker was excavated in South Dakota, the contract for Debtors' services was executed by the parties in both Colorado and Pennsylvania, and the work performed by Debtors occurred in Colorado. Therefore, at the trial on this matter the Court requested the parties to brief the choice of laws issues in the case. In their briefs, the parties stipulate that the law of Pennsylvania should govern the resolution of this matter. Therefore, the Court will apply Pennsylvania law.

9

*Ins. Co. v. Jerry's Sport Center, Inc.*, 2 A.3d 526, 532 (Pa. Supreme 2010). "The *sine qua non* of a claim in *quantum meruit* is unjust enrichment." *Limbach Company, LLC v. City of Philadelphia*, 905 A.2d 567, 575 (Pa. Commonwealth 2006). "Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred." *Id.* (citing *Schenck v. K.E. David, Ltd.*, 446 Pa. Super. 94, 666 A.2d 327, 328 - 29 (1995)).

The "value of the benefit conferred" is to be measured by comparing the reasonable market value of the property after the artisan has performed his work against the reasonable market value of the property before the work was performed. *D. A. Hill Company v. Clevetrust Realty Investors*, 524 Pa. 425, 573 A.2d 1005 (1990). In short, the measure of damages is "value added." In *D. A. Hill*, a mall developer defaulted on a construction loan before completing a building project, leaving certain subcontractors without payment for their work. The developer's lender then foreclosed on the property. In turn, the unpaid subcontractors sued the lender, asserting that it was unjustly enriched by the value of the work they performed. The subcontractors attempted to prove their damages by admitting their unpaid invoices into evidence. The trial court found this evidence to be an appropriate measure of damages and entered judgment in favor of the subcontractors. On allocatur from the Superior Court, which had affirmed the decision below, the Supreme Court rejected this evidence as "irrelevant to the question of enrichment" and reversed the trial court's judgment. *D. A. Hill*, 524 Pa. at 433, 573 A.2d at 1010. Quoting *Meehan v. Cheltenham Township*, 410 Pa. 446, 189 A.2d 593 (1963), the Supreme Court reiterated that a plaintiff prosecuting a case for unjust enrichment "cannot merely allege its own loss as the measure of recovery – i.e., the value of labor and materials expended –

10

but instead must demonstrate that [the defendant] has in fact benefitted." *D. A. Hill*, 524 Pa. at 431, 573 A.2d at 1009.[9]  Because the measure of recovery in an unjust enrichment case is the value of the benefit to the enriched party, the *D. A. Hill* decision considered the appraised value of the mall after the lender had foreclosed versus the amount of money actually advanced by the lender during the course of construction.  *Id.* 524 Pa. at 433, 573 A.2d at 1010.

Like the subcontractors' reliance on their invoices as evidence of the lender's unjust enrichment, the Trustee in this case relied almost exclusively on Debtors' time spent working on the specimen as evidence of Frithiof's unjust enrichment.  The thrust of the Trustee's case was that the estate's damages could be measured by multiplying the hours of labor performed by Debtors (and their daughter) by an hourly rate that could reasonably have been charged by them in 2003 given their professional qualifications and the compensation standards of the industry at that time.  Under *D.A. Hill*, this evidence is not relevant.

While the Trustee also attempted to introduce evidence of the value of the fossil through an appraisal, that evidence was excluded as hearsay.  Accordingly, the record is barren of evidence of "value added" by which to measure damages in *quantum meruit*, i.e. the value of the fossil before Debtors commenced their work versus the value after they stopped working.  The

---

[9]Both *Meehan* and *D.A. Hill* adopted the Restatement of Restitution regarding the measure of damages for unjust enrichment, which provided as follows:

> Where the value of the benefit differs from the amount of the loss, and the recipient is free from fault, the amount of recovery is generally limited by the value of the benefit. See Restatement, Restitution § 1, comment e (1936).

*D.A. Hill*, 524 Pa. at 431, 573 A.2d at 1009 (citing *Meehan*, 410 Pa. at 450, n. 5, 189 A.2d at 595, n. 5).

testimony adduced by the Trustee was simply too amorphous and generalized to provide a basis for quantifying the gain or enrichment obtained by Frithiof as a result of Debtors' work.

In his brief, the Trustee acknowledges the position reflected in the Restatement of Restitution that the proper measure of damages in an unjust enrichment case is the value added by the plaintiff to the defendant's property. However, the Trustee cites neither *Meehan* nor *D. A. Hill*, even though both specifically adopted the Restatement.[10] Rather, the Trustee quotes extensively from *American Jurisprudence 2d*, and its discussion of restitution and implied contracts. While certainly a useful research tool, this legal encyclopedia does not constitute controlling legal authority in Pennsylvania. Therefore, its discussion, however informative, is not persuasive.

For these reasons, judgment will be entered against the Trustee on his claim for damages under *quantum meruit*.

B. *The Trustee's case for recovery based upon an artisan's lien*

Unlike damages in *quantum meruit*, the value of a common law artisan's lien is not measured exclusively in terms of value added. "'Whenever a workman or artisan by his labor or skill increases the value of personal property placed in his possession to be improved he has a lien upon it for his *proper charges* until paid. . . .'" *Mack Trucks, Inc. v. Performance Associates Corp.,* 381 Pa.Super. 173, 177, 553 A.2d 412, 414 (1989) (quoting *Meyers v. Bratespiece,* 174 Pa. 119, 121, 34 A. 551 (1896) (emphasis added)). "The artisan's lien arises . . . when work has been performed on a chattel or materials have been added to a chattel, thereby increasing the chattel's value." *Mack Trucks, Inc.*, 381 Pa. Super at 177, 553 A.2d at 414 (citing *Associates*

---

[10]Opposing counsel filed a brief but also failed to cite either *Meehan* or *D.A. Hill.*

12

*Financial Services Co. v. O'Dell,* 491 Pa. 1, 417 A.2d 604 (1980)). The artisan is entitled to a

possessory lien and he has no obligation to release the lien until he has been paid for the value of

his services. *Mack Trucks*, 381 Pa. at 177, 553 A.2d at 414; *Mellon National Bank and Trust*

*Company v. Wagner,* 198 Pa. Super. 290, 182 A.2d 284 (1962) (purchaser of tapestry would not

be entitled to possession of tapestry as long as artisan remained unpaid for her work); *Blair to*

*Use of Davis v. Adamchick,* 145 Pa. Super. 125, 21 A.2d 107 (1941) (vehicle repairman was

entitled to possessory lien until payment from owner for repairs completed on the vehicle was

received).

"In Pennsylvania, a common law lien permits one who adds to the value of another

person's chattel by labor, skill or material, at the other's request, to retain the chattel until he or

she is paid for the value of the services rendered." *Aircraft Repair Services v. Stambaugh's Air*

*Service, Inc.*, 175 F.3d 314, 318 (3d Cir. 1999) (citing *O'Dell,* 417 A.2d at 606; *International*

*Elecs. Co. v. N.S.T. Metal Prods. Co.,* 370 Pa. 213, 88 A.2d 40, 45 (1952); *Meyers v.*

*Bratespiece, supra*). "A person in possession of property under a lien is owner of it against all

the world and no one may disturb his possession, even the actual owner, until the claim is paid."

*Stambaugh's Air Service, Inc.*, 175 F.3d 314, 318 (3d Cir. 1999) (quoting *Cernica v. Wagner's*

*Wheel Alinement, Inc.,* 27 Pa. D. & C. 3d 678, 681, 1983 WL 391 (1983)). "Under Pennsylvania

law (and common law in general), a repairman's lien is invalid only if the lienor asserts his or her

claim fraudulently or in bad faith." *Stambaugh's Air Service*, 175 F.3d at 319 (citing *Wilson v.*

*Highway Serv. Marineland,*, 274 Pa. Super. 391, 418 A.2d 462, 464-65 (1980); *Wensel v. Reed,*

161 Pa. Super. 488, 55 A.2d 548 (1947); *Cernica,* 27 Pa. D. & C.3d at 681-82 (other citations

omitted)). "[A]bsent fraud or bad faith[,] the lien is not lost or reduced until a determination by judicial process of the proper amount owing."[11] *Cernica*, 27 Pa. D. & C. 3d at 682.

In this case, there is no dispute that Debtors obtained possession of Tinker at the request of its owner, The Tinker Group. It also is clear that Debtors performed an estimable amount of work on the fossils. Although Frithiof ardently disputed Debtors' claims regarding the number of hours they devoted to preparing the Tinker fossil, he acknowledges that the fossils were encased in matrix prior to being transferred to Debtors' possession and that on June 7, 2003, when he visited the Colorado workshop, all of the jackets were empty. Thus, Debtors preformed valuable services in furtherance of the Tinker Contract and have a lien on the fossil bones and fragments for the value of the services performed.

At trial, Magovern testified on behalf of the Trustee regarding the hourly fee that could have been charged under existing industry standards by Debtors for their work on the Tinker specimen in 2003. On cross examination, Magovern agreed with Frithiof's counsel that a rate of

---

[11]In Pennsylvania, when an artisan's lien has been asserted and the actual owner wishes to obtain possession of the chattel at issue, "the actual owner has two options: the owner may satisfy the lien and then sue for return of the alleged overcharge, or bring an action for replevin and [then] request[] a writ of seizure. The plaintiff may recover the property pending a final decision on its claim pursuant to a writ of seizure by posting a bond for twice the value of the chattel, or such other amount as the court deems appropriate. The repairman then loses his or her legal right to retain the chattel pending resolution of the replevin action." *Stambaugh's Air Service, Inc*., 175 F.3d at 318 -319 (citing Pa. R. Civ. P. 1071-1088). With regard to the lien *sub judice*, on January 18, 2010, Frithiof filed a motion for relief from stay in the main case to obtain possession of the Tinker fossils. Frithiof did not invoke either of the options described in *Stambaugh* as grounds for replevin of the fossils. Rather, he simply averred that the asserted value of the Trustee's interest, $75,000, was "adequately protected" by a lien on certain other assets. On February 22, 2010, an Order was entered to resolve Frithiof's motion by giving him the opportunity to post a bond in the amount of $80,000 in exchange for possession of the fossils. To date, Frithiof has failed to post the bond.

$35 per hour would have been reasonable. In his brief, the Trustee concedes that $35 is reasonable. Accordingly, I will use that rate to determine the reasonable value of Debtors' compensable services.

The parties agree that Debtors took possession of twenty-eight plaster jackets when they commenced work under the Tinker Contract. They also took possession of a quantity of matrix. Debtors described their preparation work in three separate categories of tasks: (1) extracting the fossils from the jackets; (2) sifting through the matrix for fragments of teeth and bone; and (3) removing matrix, cleaning, repairing, and gluing the bones.

Barry testified that he alone worked on extracting the fossils from their jackets, while April and Catherine sifted through the matrix. He testified that he spent at least sixteen hours on each of the twenty-eight jackets, for a total of 448 hours of work. He further testified that April and Catherine spent at least fifty-six hours per week for four weeks sifting matrix. Finally, he testified that he and April spent a total of 672 combined hours preparing the bones for mounting. These tasks were described in a letter sent by Barry to the Trustee in November 2005.

Frithiof challenged Barry's testimony in the following ways. Frithiof testified that the jackets were far from uniform in size, that most were small, and that the matrix was sand-like rather than concrete. Because of the lack of uniformity in the jackets' sizes, he characterized the assertion that Barry expended sixteen hours of work on each jacket as "silly." (N.T. 147). Frithiof testified that he intended the non-jacketed matrix to constitute "provenance" of the authenticity of the fossils and that he had not anticipated that Debtors would need to sift it in performance of their duties under the Agreement. Frithiof discredited Debtors' testimony

15

regarding the 672 hours allegedly spent preparing the bones for mounting by noting the undisputed fact that none of the bones are currently mounted. He also pointed out that it was impossible for Barry to have worked full time on Tinker between May 12 and June 7 when he admittedly was working on other specimens at the time.

I agree that Barry's estimates of time spent working on Tinker are inflated. His assertion that he worked every day for twelve straight weeks removing matrix from the bones and then cleaning, repairing and gluing the bones consumes a time period in excess of the total time he was working at Jurassic Pines. He then asserts that he spent additional time going through the matrix and removing fossil bones encased in the "iron concretions," which further inflates the time estimate. The calculations set forth in his letter to the Trustee dated November 3, 2005 (Trustee's Exhibit 32), from which he testified at trial, conflict with other correspondence to the Trustee dated October 28, 2009 (Defendant's Exhibit 19). Therefore, I am unable to accept Barry's representation at face value. But even though the calculations lack precision, they do form a basis for formulating a reasonable estimate of the time Barry devoted to the Tinker project.

Barry testified that Debtors and their daughter Catherine worked on the Tinker project between March 13, 2003 and June 7, 2003. However, in a letter to friends dated May 24, 2003, April stated that Debtors had been in Colorado for eight weeks, which would make March 28 the more likely start date for their work at Jurassic Pines. Because Barry admitted that he did no further work on Tinker after June 7, 2003, the maximum time he could have devoted to work on this specimen is ten rather than twelve weeks. April's letter also states that Barry had spent the week prior to the date of the letter working on another specimen, which would further shorten the

16

time devoted to Tinker to nine weeks. But Barry also furthered the Tinker project by helping

Debrovner transport the Tinker bones and related materials from Iowa to Colorado. Barry

testified that it took approximately one-half day pack the items. There is no testimony specifying

the time the two men took to drive from Iowa to Jurassic Pines, but it is unlikely that it took more

than two days. Therefore, I will assume that Barry spent nine weeks and three days working on

the Tinker project.

     In 2005 Barry estimated he was working on Tinker fifty-six hours a week and in 2009 he

estimated he worked fifty hours per week on the specimen. For purposes of deciding this matter,

and with no other evidence available about the amount of time spent per week on the Tinker

project, I will assume that he worked fifty-six hours a week for nine weeks and three days.

Therefore, I find that Barry worked on Tinker a total of 528 hours. At a rate of compensation of

$35 per hour, Barry's services may be reasonably valued at $18,480.

     Just as I cannot unreservedly credit Barry's testimony regarding his own time, I cannot

accept his testimony that the Trustee is entitled to recover against Defendants for the time spent

by April and Catherine sifting matrix. Frithiof testified that he intended this material to be used

as provenance of the authenticity of the fossils, and it was not his intent that the "sifting" work

should be performed.  Had Frithiof specifically requested the work, or were there any evidence

that bone fragments were found that added value to the specimen, it would be appropriate to

conclude that the Trustee is entitled to an artisan's lien for the value of April's time. Catherine,

however, was not a party to the Tinker Contract, and Frithiof and Hollrah could not reasonably

be expected to compensate the bankruptcy estate for her gratuitous services.[12] *See Welded Tube Co. of America v. Phoenix Steel Corp.* 377 F.Supp. 74 (E.D. Pa. 1974) (Steel fabricator with agreement to fabricate steel tubing for steel company not entitled to lien for shot blasting, oiling and slitting where not requested by steel company.)

The final component of the Trustee's lien claim consists of the value of the hours devoted by Barry and April to the preparation of the bones for mounting. I have already credited Barry with 504 hours of work (not including the 24 hours also credited for the Iowa to Colorado trip), which comprises the entire span of weeks during which Debtors worked on Tinker. Therefore, I need only consider April's bone preparation work. April not having appeared to testify, the record lacks evidence describing or showing how the bones were "prepared." There is no description in the record of the appearance or condition of the fossils immediately after Barry finished the extraction process and their appearance or condition after April (and Barry) ceased their work preparing the fossils for mounting. Lacking evidence of what services April specifically performed, I cannot speculate the value of her services to the performance of the Tinker Contract. To the contrary, I may infer that her services were not of significant value. "Where a party fails to call an available witness whose testimony could be expected to favor him, a natural inference arises that the witness would have exposed facts unfavorable to that party." *In re Groggel* 333 B.R. 261, 303-04 (Bankr. W.D. Pa. 2005) (citing *United States v. Busic,* 587

---

[12]The matter of April and Catherine's work sifting matrix may be analogized to the car owner who takes his vehicle to a mechanic solely for an oil change, but the mechanic unilaterally decides to steam-clean the engine along with changing the oil, and then seeks to increase the amount of his charges by the hourly value of his steam-cleaning work. Clearly, it would not be appropriate to allow the mechanic to assert a possessory lien against the vehicle for the value of the cleaning.

18

F.2d 577, 586 (3rd Cir.1978)); *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 206 (3rd Cir.1970) (stating general rule in somewhat similar fashion); *United States v. Restaino*, 369 F.2d 544, 547 (3rd Cir.1966) (same) (other citations omitted)). *See also In re Miller Homes*, 2009 WL 4430267, *9 (Bankr. D. N.J.).

In summary, the testimony and evidence support a finding that Barry performed professional services in a workmanlike manner at Frithiof's request on the Tinker fossil. The record supports a finding that Barry devoted 528 hours to performing these services. At a rate of $35 per hours, the value of these professional services total $18,480. The additional time Barry claimed separately for the process of removing the bones from the plaster jackets duplicates time already accounted for and will not be considered. Finally, in the absence of testimony by April regarding the services she performed in preparing the Tinker fossil, I am unable to determine the nature and value of the services she performed.

*A. The $50,000 advance from Colorado Dinosaur to Prehistoric Journeys*

The Jurassic Pines Agreement required Colorado Dinosaur to advance Debtors $50,000 that was to be repaid once Tinker was sold. In compliance with this provision, Debrovner advanced the $50,000 to Debtors at the inception of the agreement.

In the matter before me, Defendants argue that if judgment is rendered in favor of the Trustee, the judgment should be offset by the $50,000 advanced by Debrovner through Colorado Dinosaur because repayment of the debt was tied to the sale of Tinker. This argument is flawed because an artisan's lien is properly asserted against the *owners* of the chattel on which the artisan performed his work. *See Mack Trucks*, 381 Pa. Super. at 177, 553 A.2d at 413; *Williamsport National Bank v. Shrey*, 417 Pa. Super. 563, 566, 612 A.2d 1083 (1992). Debrovner

19

holds no ownership interest in the Tinker fossil. The record indicates that the owners of the fossils are The Tinker Group, which consists of Frithiof and Hollrah. Therefore, the $50,000 advanced by Debrovner is not relevant to the value of the artisan's lien on property owned by The Tinker Group, or to the amount that must be paid to the Trustee in order for the lien to be released.

More generally, setoff is permitted in a bankruptcy case under 11 U.S.C. § 533 only if there is a mutuality of obligations between the debtor and the creditor. "To be mutual, the debts must be in the same right and between the same parties, standing in the same capacity." *In re Bevill, Bresler & Schulman Asset Management Corp.,* 896 F.2d 54, 59 (3d Cir.1990) (quoting 4 *Collier on Bankruptcy,* ¶ 553.04[3], at 553-22 (15th ed.1979)). In this case, the Trustee has a claim against The Tinker Group and Debrovner has a claim against Debtors. There is no mutuality, so setoff is not permitted.[13] It also should be noted that this finding does not affect the merits of the proof of claim filed in this case by Debrovner.

---

[13]Since Debrovner is not liable on the judgment for the value of the artisan's lien, the case will be dismissed as against him.

## Conclusion

The Trustee has failed to prove damages in *quantum meruit* for the work that Debtors'
performed on the Tinker fossils. The Trustee has properly asserted an artisan's lien against the
fossils, the value of which is $18,480. Judgment will be granted in favor of the Trustee and
against Frithiof and Hollrah on the artisan's lien claim and against the Trustee and in favor of the
Defendants on the *quantum meruit* claim.[14]

**By the Court,**

*Mary D France*

Chief Bankruptcy Judge

Date:  March 4, 2011

---

[14]Because Harrell is not an owner of the Tinker specimen, the case will be dismissed as to
her.